Staples, J.,
delivered the opinion of the court.
At the time of the commencement of this controversy, in the year 1871, the Virginia and Tennessee Railroad Company was required, by act of the legislature, to report annually to the auditor of public accounts the estimated value of all its real and personal estate of every description. It was also required to .report quarterly the net earnings of the road for the three preceding months, and at the same time to pay into the treasury of the state the taxes imposed by law. So that the company, instead of. being assessed in the different counties in which its road was located, was assessed as an entirety.
The assessment for state taxes was not made,-as in ordinary cases, by the township assessors, but by the company itself to the auditor of public accounts, and the taxes were paid, not to the county treasurer, but directly "into the state treasury.
The same provisions were applied to the other railroad companies and canal companies, and, with some modfications, to the insurance and telegraphic companies doing business in the state. This mode of assessment and taxation has been continued and is still pursued by the legislature. Acts of 1869-70, page 312; Acts of 1870-71, page 93.
*473 In the year 1871, the County of 'Washington claimed the right to impose the county levies upon the property of the Virginia and Tennessee Eailroad Company in that county, and it caused to be assessed for that purpose the road-bed and other real estate within its limits. This claim was resisted by the company, but was sustained both by the county and circuit courts of that county. The case is brought here by writ of error to the judgment of the last-named court. The grounds upon which the parties respectively rest their pretensions will be considered in the course of this opinion.
An examination of the various acts of the legislature on the subject will show that for many years the county levies and poor rates were confined to the titheables within their limits. Eeal and personal property was not made the subject of county levy until long after the revisal of 1819. At what precise period this was done I have not been able to ascertain, as the acts of the general assembly showing the fact cannot be had in this place. It was probably as far back as the year 1824 or 1825. See 2 Rev. Code 1819, page 63; Code of 1849, page 277, sec. 4. But under all the acts subjecting property to county levies, the levy in every case was limited to those subjects assessed with state taxes within the county. Under former constitutions and laws the practice was for the justices of the county, a majority being present, to settle the accounts of the county, and to proceed to lay the levy upon property assessed with state taxes according to the land and property books as made out by the commissioner of the revenue for state purposes. The result was that under no circumstances could there be a county levy upon property unless it was assessed within the county for state taxation. This was the uniform rule, never departed from pi’ior to the adoption of the present constitution. It is claimed, however, *474 that that instrument has changed the law upon this subj e°t, and that power is now conferred upon the county respectively to lay the county levies upon all subjects of taxation not specially exempt under the constihition, independently of legislative sanction, and whether such subjects are or are not assessed for purposes of state taxation.
jt will be admitted that when an enactment, constitutional or legislative, is relied on- as effecting a radical change in the policy of the government, as pursued for forty years—a policy founded upon sound reason and common justice—the language of such enactment ought to be very explicit in its terms. More especially is this true when applied to the subject of taxation, a subject peculiarly within legislative discretion, involving the highest attributes of sovereignty and affecting all classes and conditions of society. The legislature is invested with complete power over the subject of taxation, except so far as may be otherwise provided in the constitution. On the other hand, the counties are mere auxiliaries of the government, established simply for the more effective administration of justice; and the power of taxation as confided to them is a delegated trust, and is to be strictly construed. They act not by virtue of any inherent power, but as mere agencies of the state. City of Richmond v. Daniel, 14 Gratt. 385; 21 Gratt. 604, 617.
In this case it is claimed that an independent sovereign power not only of imposing taxes, but also of designating the subjects of taxation, is conferred upon each board of supervisors in every county and township of the state. It cannot be going too far to say that the men composing these boards are not generally elected with reference to such duties, nor are they qualified by their pursuits, information or position for the exercise of a trust so delicate and responsible. It is difficult to believe it was ever intended to confer upon these boards a power which the *475 state would nevei* bestow upon her magistrates at a time when the county court was composed of some of the most intelligent and responsible citizens of the state.
The pi’ovision of the constitution relied on as conferring this power is found in section 2, article 7, of that instrument. That section, after providing that each county shall be divided into townships, in each of which there shall be annually elected one supervisor and certain other officers therein named; declares: “ The supervisors of each township shall constitute the board of supervisors for that county, and shall assemble at the court-house thereof on the first Monday of December in each year, and pi’oceed to audit the accounts of said county, examine the books of the assessors, and regulate and equalize the valuation of property, fix the county levies for the ensuing year, apportion the same among the several townships, and perform such other duties as shall be prescribed by law.”
The words relied on as conferring the power in question are, “ to fix the county levies for the ensuing year, and apportion the same among thé various townships.” The learned counsel for the county of "Washington, in commenting upon these words, insists they confer upon the supervisors authority to ascertain the levy, to establish a levy and to impose a levy, and to divide the same among the several townships; and that this is but an exercise of the taxing power under the constitution. All this may .be conceded, and the question still arises, how are the supervisors to ascertain the subjects of taxation for the county levy ? To what source are they to look for the necessary information to guide them with respect to the taxable property? The answer is found in the section already cited, which declares they shall “ examine the assessors’ books.” And a subsequent section of the same article provides that the general assembly, at its first session after the adoption of the constitution, shall *476 pass such laws as may be necessary to give effect to the provisions of this article. The legislature accordingly provided for the election of assessors; it prescribed that their duties and powers should be the same as those of the former commissioners of the revenue; it required them to assess the property of their respective townships; to make out the land and property books in the manner required of the commissioners of the revenue—a copy of which was to be sent to the auditor of public accounts, another delivered to the county treasurer, and another to the' clerk of the county for the use of the board of supervisors. Acts of 1869 and 1870, pages 80 and 282. These are the books to which the constitution refers, by which the state taxes are ascertained and collected, and by which the supervisors must be governed, as were the former justices of the peace, in laying, the county and township levies. The conclusion is inevitable, therefore, that the board of supervisors in laying the county levies must look to the books provided for the state assessment, and to the subjects of taxation as contained in those books.
This must be so, unless we are to suppose that the framers of the constitution intended to inflict upon the state a complex and expensive system requiring two sets of assessors, one for the state and the other for the counties, with two sets of books containing different valuations of property and different subjects of taxation. The more reasonablé presumption is, that they legislated with inference to the former system, simply substituting the supervisors in place of the justices, and confining the county levy to such property, real and personal, as was assessed with a state tax within the county. Acts of 1869 and 1870, § 74, p. 284; p. 306, § 47.
It is very true that the section already quoted also confers upon the board of supervisors the power to equalize and regulate the valuation of property. I am free to confess that, after the most careful examination *477 and reflection, I am unable to say what these words precisely mean. It is very probable they were taken from the constitution of some one of the northern states, where they have equalization boards, as they are called. These boards have a sort of appellate power for the purpose of an equalization, in case the assessment of one district is found to be relatively higher or lower than that of another, so that if the general taxes were to be assessed upon it, the district would pay more or less than its due proportion. This is not done by changing individual assessments, but by fixing the aggregate for the several districts at what in the opinion of the board they shall be, so that general taxes may be levied according to this determination, instead of on the assessors’ footings. This is the construction generally given to the laws relating to the equalization boards in other states. Cooley on Taxation, p. 290.
But whatever may be the meaning of the words in ■our constitution just quoted, it is very clear the power to regulate and equalize the valuation of property cannot be construed as giving authority to change the assessors’ books and to prescribe new subjects of taxation different from those assessed by the state.
The learned counsel for the County of Washington maintain that the legislature, in various acts passed from time to time since the adoption of the constitution, has recognized this power as vested in the board of supervisors ; and in support of this position he relies upon the fact that the legislature in prescribing the duties and powers of the supervisors, has used the same words contained in the constitution. I submit to the learned counsel, this is reasoning in a circle. If the words in question had a fixed, well-ascertained meaning, we might easily understand what the legislature intended in incorporating them in one of its statutes. Sometimes the legislative department, finding great difficulties in the construction *478 of a constitutional provision, embodies it in a statute, leaving it to the courts to give to it the proper interpretation.
But in the present case we are left in no difficulty as the meaning of the legislature. In the very first act on the subject, passed 9th of July, 1870, Acts of 1869 and ’70, page 332, the supervisors of the respective counties are required to convene the 1st of July, 1870, and to lay the county levy for the year 1870, according to the provisions of sections 2, 3 and 4 of chapter 53, Code of 1860, so far as the same are applicable. One of the sections thus referred to limits the levy in express terms to property assessed with state taxes within the county. This act was followed by the act of March 19th, 1872, which confers upon the supervisors authority to “ fix the amount of the county levies for the ensuing year, to order the levy on all male persons over twenty-one years of age, and on all property assessed with state taxes within the countyor the order of levy may be a certain sum on all male persons over the age of twenty-one years, and for a certain per centum upon the amount of the state tax, and to apportion the same among the various townships of the county. Acts of 1871 and ’72, page 291. The act of March 26th, 1875, contains substantially the same provisions. Acts of 1874 and ’75, page 355. These enactments show that the legislature was of opinion that the supervisors are not clothed with the power of assessment and taxation under the constitution, without the aid of legislation. They further show that the design was to adhere to the policy pursued for forty years, and to confine the county levies to those subjects assessed with state taxes within the respective counties.
It is said, however, that the words “ within the county,” refer to the location of the property, and not to the place where the assessment may be made; and the statute *479 ought to be construed as if it read: “ the board of supervisors shall have power to order the levy on all property within the county assessed with state taxes.” It is cient to say that the words used in the act of 1872 and in all the subsequent acts, are the same as those used in the Code of 1849, the Code of 1860, and indeed in all the acts prior * x to the adoption of the present constitution. Their meaning, as used in these prior enactments, was well understood, and that is, that the county levies were confined to property assessed with state taxes within the county by the commissioners of the revenue. It must be presumed that the legislature, in- adopting the same words in the more recent enactments, intended to give them the construction uniformly given to them.
There is but- one act, ever passed by the legislature which at all militates against this view, and that is the act of March 15th, 1872. It is there provided that “ where a railroad or canal shall pass through more than one of the counties of the state, the report (of the company) shall show the estimated value of the property herein-above classified that may be within the limits of each of said counties; and it shall be the duty of the auditor of public accounts to furnish tile board of supervisors of each of the counties of the state through which any railroad or canal passes, such estimated value of the property herein-above specified, as appears from such report to be within the limits of each of said counties.” Now, it would seem to be very clear that the object of this enactment was to furnish a basis for the assessment and imposition of county levies upon the various railroads of the state, and thus to remove all the difficulties growing out of a want of legislation upon that subject;' and yet we find at the next session of the legislature, April 5th, 1872, an act was passed in which it is expressly provided that section 91, just cited, shall not authorize the supervisors in any county through which said railroad or canal *480 may pass, to assess, levy or collect any tax for county or township purposes on the valuation of properties classiin the report required hy the said 91st section of the assessment act.
The provisions of the act of March 15th, 1872, have been omitted in all the subsequent acts on the subject. 1 ü If, therefore, the legislature at one time manifested a purp0ge cpai.ge the various railroads of the state with county levies, that purpose was immediately abandoned and never again asserted.
The whole theory of our system of taxation is based upon the idea that it is prepared by the representatives of the people upon due deliberation and reflection, and when thus prepared for state purposes it may be safely applied to the counties and other local agencies of the commonwealth. And any rule of construction and doctrine which would give to these agencies a power of taxation under the constitution, independent of all legistive supervision and control, is in violation of the uniform policy of the state, and contrary to the true principles of the government. "When, therefore, the constitution gives the supervisors authority “ to fix the county levies,” it only means they shall ascertain and fix the amount of such levies, and the amount thus ascertained is to be collected from such subjects of taxation as. are prescribed by the legislature.
It has been argued, however, that under the present constitution taxation, whether imposed by the state, county or corporation bodies, shall be uniform; and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as prescribed by law. And in this respect the present constitution differs very materially from that of 1851. And further, that the legislature has no power to exempt any property from county levy if it so desired. See § 1, art. 10 of the constitution, let all this be conceded, and still it is not perceived in *481 what way it helps the County of Washington. If all property must he taxed as well hy the county as by the state, it can be done only in the manner prescribed by law. As already stated, the constitution makes it the duty of the legislature to pass such laws as are necessary to carry its provisions, relating to taxation, into execution. The legislature has made no provision for imposing county levies upon the railroads of the state. So far from it, as has been seen, it has by inevitable implication •exempted them from such levies.
If the commissioners of the revenue, or the assessors in the different counties, should make an assessment of the railroad track, or other property within their limits, ■such assessment would' constitute no just basis of taxation. A part of a railroad running through one county may be of little value, but if taken in connection with the whole, it may be as valuable as any other part. As was said by the supreme court of Kentucky: “A railroad, from one end to the other, is an entirety. Fragmentary taxation or sales might be unjustly vexatious and injurious to the owners, prevent the destination of the road, and disturb the public use and interest. To avoid such evils and absurdities, the law treats a railroad and all its appurtenances as one entire thing, not legally subject to •coercive severance or dislocation. In that .consolidated character it must be taxed for state revenue, and cannot be a fit subject for local taxation by the separate counties through which it runs.” Applegate v. Ernst, 3 Bush. R. 648.
And in Gulph R. R. v. Moores, 7 Kansas R. 210, it was said : “A railroad is an entire thing, and should be assessed as a whole. It would be almost as easy and reasonable to divide a house or a locomotive into portions and assess each portion separately as to divide a railroad into portions and assess each portion of it sep *482 arately.” The policy of Virginia has uniformly been in accordance with the views expressed in these cases. Prior to the war the assessment and taxation were based upon the dividends, or upon the receipts of the companies, ascertained by reference to the number of passengers or the amount of freight transported. Code of 1849, ch. 39, § 1 to 5; Code of I860, p. 200. Since the war, as has been already seen, the tax has been upon the net earnings of the respective roads, paid quarterly into the treasury. The state has, therefore, never regarded any mere local assessment of a part of a railroad within a county as furnishing any reliable basis of taxation. At the very time the legislature was providing for the reassessment of lands throughout the commonwealth, in the year 1870, it required the railroads and canals to be assessed, not with reference to any valuation so made, but entirely upon different principles. These considerations plainly show that the assessment of lands made in the different counties by the assessors of the several townships, for purposes of state taxation and county levy, were never designed to include the property of the railroad and canal companies located in those counties. It would be most extraordinary indeed that the legislature should repudiate the whole system of local assessment and taxation as utterly unjust and impracticable when applied to railroads, and at the same time confer upon the supervisors of each county the power to apply that system to the same railroads in its most objectionable form, based upon crude and conjectural valuations-by men without the necessary qualifications or means of information for such duties. It is impossible to foresee the mischiefs that would flow from such a policy, if every county from Norfolk to Bristol is to be invested with the power of assessing and taxing the railroad within its limits, and it is easy to see that this company, if not *483 taxed out of existence, would have to bear the most grievous burdens, far beyond its resources.
It is stated by counsel that the state tax on that portion of the road between Lynchburg and Bristol, is ten thousand dollars. It is conceded that if the other eight counties between those points impose a levy in proportion to that of Washington County, the amount will exceed fifteen thousand dollars, five thousand dollars more than the entire state tax.
One of the counsel of the appellant, upon a calculation made by him, estimates the county levies as three times the amount of the state tax. However all this may be, it is most obvious that the legislature, so far from making any provision for imposing the county levies upon the railroads of the state, has plainly evinced a purpose to prohibit the imposition of county levies in such cases.
And until the legislature makes the necessary provision for carrying the constitution into effect in this particular, neither the supervisors of the county nor the courts can furnish a remedy or supply the want of proper legislation. In this connection it may not be amiss to quote from the observations of a very eminent author upon what are termed self-executing provisions in a constitution. He says: “ That although all the provisions of a constitution are to be regarded as mandatory, there are none which from the nature of the case are as incapable of compulsory enforcement as are directory provisions in general. The reason is, that while the purpose may be to establish rights, or to impose duties, they do not in and of themselves constitute a sufficient rule by means of which such right may be protected or such duty enforced. In such cases, before the constitutional provision can be made effectual, supplementary legislation must be had, and the provision is in its nature mandatory to the legislature to enact the needful legislation, though back of it there lies no authority to enforce the command. *484 Sometimes the constitution, in terms, requires the legislature to enact laws on a particular subject, and here it is obvious that the requirement has only a moral force. The legislature ought to obey it, but the right intended to be given is only assured when the legislation is voluntarily enacted. Illustrations may be found in constitutional' provisions requiring the legislature to provide, by law, uniform and just rules for the assessment and collection of taxes. These must lie dormant until the legislation is had. They do not displace the law previously in force, though the purpose may be manifest to do away with it by the legislation required.” Cooley’s Constitutional Limitations, pp. 99, 100.
These observations of the learned author could hardly be more apposite if they had been made with direct reference to the provision of the constitution now under consideration. But in taking the view just now presented, it is by no means conceded that the constitutional provision requiring all property to be taxed according to its value, has any application to county levies. Under the. constitution of 1851, taxation was required to be equal and uniform throughout the commonwealth, and all property was to be taxed according to its value. It was held by this court that these provisions did not apply to county levies, but solely to taxation for purposes of state revenue. So that while the state taxes were required to be equal and uniform, the county levies were not subject to any such condition. Gilkeson v. The Frederick Justices, 13 Gratt. 577. Under the present constitution the rule of uniformity and equality is applied to county taxation as well as to the state, but it does not therefore necessarily follow that the rule requiring all property to be taxed according to its value, is also to be applied to county taxation. Upon this point we do not desire 'to express any opinion. It is a very grave and important question, only to be decided upon the fullest consideration. This *485 case is readily disposed of upon other grounds already presented. I think that the supervisors of Washington County were not authorized to impose the levies upon the property of the Virginia and Tennessee Eailroad Company, not assessed with state taxes in that county. If the County of Washington and other counties oi the state are improperly deprived oí a source ot revenue from property within their limits, it is for the legislature to apply the remedy. It is worthy of remark, however, that no such power has ever been asserted by any of the counties until tiie present claim was put forth by the County of Washington; nor, so far as our information .extends, has there been any complaint of injustice done to the counties by the system of taxation adopted by the state with respect to her railroad companies. But without pursuing the topic further, I am of the opinion that the circuit court and county court of Washington County erred in refusing to exonerate the company from the payment of county levies and township taxes assessed against it by the County of Washington for the year 1870, and for that error both of said judgments must be reversed and a judgment entered in conformity with the views herein expressed. ■
The judgment in each case is the same, except that the first only referred to county and township levies. The second was as follows:
This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the judgment aforesaid, and the argument of counsel, is of the opinion, for reasons stated in writing and filed with the record, that the county court and the circuit court of Washington County erred in refusing to exonerate the plaintiff in error, the Virginia and Tennessee Eailroad Company, from the county levy, town *486 ship, school and road taxes for the year 1878. It is therefore considered by the court, that the said judgment of the said circuit court be reversed and annulled, and that the defendant in error pay to the plaintiff in error its costs by it expended in the prosecution of its writ of error and supersedeas here. And this court proceeding to render such judgment as the said circuit court ought to have rendered, it is further considered, that the judgment of the said county court be reversed and annulled, and that the defendant in error pay to the plaintiff in error its costs by it expended in the prosecution of its writ of error and supersedeas in the said circuit court. And it is further considered that the plaintiff in error be and it is hereby exonerated from the payment of the county levy and township, school and road taxes of the County of Washington for the year 1873, and recover of the county the costs of-its motion in said county court. All of which is ordered to be certified to the said circuit court.
Judgment reversed.